Good morning, Your Honors. May it please the Court, my name is Nancy Miller, and I represent Petitioner Giovanni Santos in this matter. This morning I'd like to discuss three issues. The first is whether or not this Court has jurisdiction to review the BIA's denial of the motion to reopen the visa revocation proceedings. The second issue is whether or not the – assuming there is jurisdiction that the Board of Immigration Appeals clearly erred in denying the visa revocation motion to reopen. The third issue is whether or not the Board erred in the legal error in denying the motion to reopen the deportation or removal proceedings. With regard to the first issue, the Ninth Circuit and the Supreme Court have held that this Court, or the Court of Appeals, has jurisdiction on all matters in which the validity of a final order is contingent. In this situation, while we're looking at a revocation of a visa petition, of a visa petition for a marriage, this whole case really revolves around whether or not Mr. Santos is going to be able to remain in the United States. Your argument is he can't be removed if he has a valid visa, if he's married. Well, that's probably – I think there's a step in between there, but yes, essentially that is what I'm arguing. Okay. The purpose is of jurisdiction. Right. Yes. That in point of fact, if the visa petition is granted, then he has the motion to reopen the deportation case and move on from there. So why don't you go to the visa, unless there are further questions. I'd like to understand why the visa should have been granted when he had a prior fraudulent marriage. Okay. Well, I think that that is pretty much the issue of whether or not there was a fraudulent marriage and whether or not the DHS or the service proved that there was a fraudulent sham marriage, and that in addition, what we're looking at is not a granting of a visa petition, but a revocation, which requires of the government a much higher standard. It requires of them that there be good and sufficient cause to revoke and that the revocation be supported by substantial and probative evidence. And with all due respect, Your Honors, I don't think we have that here. I think what we have to start with, before we even get to the I-130 interview, which I think was coercive and abusive, we have evidence of the validity of the marriage. The first test for validity of a marriage is what is the intent when the parties enter into the marriage. Did they intend to live together? Did they intend to actually have a marriage? If the marriage falls apart after that, that does not indicate a sham marriage. It just indicates that it's fallen as a statistic. In support of the validity of their marriage, of the bona fides of their marriage, Mr. and Mrs. Santos, the original Mrs. Santos, Carla, and he submitted proof that they had had a marriage that was attended by family and friends. This is not what is normal in a sham marriage. They usually go off and it's just the two of them and there's nobody else, and half the time the family doesn't even know that they are married. Yet they had family and friends at the marriage, at the wedding itself. Carla took his name. Carla and he had a joint bank account. They had a car in their name. She put his name on her employment records. They lived in her parents' house. And according to her, she was well paid for the service. Well, I – according to her, after being coerced extensively by the I-130 officer, she received some money. And we don't know exactly how much because she wasn't clear. She thought it was maybe 3,000 and she thought maybe she was supposed to get 6,000. If you're really being paid, you know what you're supposed to be getting paid. You're not sitting there saying, I don't know, it was sort of around here. It was here and there and maybe somewhere. This woman had been told – So how much money? It depends on whether 3,000 is a lot of money to you or not. If you get three in hand and maybe three more do and you think three in hand is a lot, you're pretty happy. Maybe. I don't know. But we don't have to speculate on that. You were arguing that this wasn't a shared marriage because A, B, and C. Yes. And she answered your because, I think, by saying I was paid and paid well to do it. So you've got to, I think, rebut that, her response, don't you? Yes, I do. All right. And I think when you look at that statement, at the statement that she was paid 3,000 and then she was supposed to get 3,000 more or approximately or somewhere in there, you have to look at the context in which she made those statements. She walks into the interview and the I-130 officer says to her and to her husband, Excuse me for interrupting you, but I don't know whether the question before us is whether there is a shared marriage or whether there wasn't. I think the question before us is whether there is a record sufficient for a reasonable person to conclude that there was a shared marriage. Yes. And if there is, that's the end of the inquiry. I think that's true. But I think that the record does raise serious questions about whether or not there – it is sufficient to revoke the I-130. And that's where I'm going with the interview. I think that the way in which she was questioned, the intimidation that she was subjected to has to be considered in determining whether or not the information or the statements that she made are reliable, whether or not they were coerced, whether or not they are voluntary, whether they're true, because they contradict a great deal of the rest of her evidence. Kagan. Have us make a credibility determination, aren't you? Well, I'm trying to – oh, I'm asking the Court to determine that the board erred in finding that there was substantial and provative evidence of the – to support their refusal to reopen or their denial of the revocation. But what you really have to argue is that the evidence compelled the finding that this was a valid marriage. And in light of testimony that she got paid for it, it's very hard to do that, isn't it? I don't think it is. And I think that it is – that it isn't hard to argue that the marriage was valid although I'm not sure that that's really the issue. I think that we really should be looking at whether or not there was the appropriate substantive and probative evidence to support the board's decision. But I'll go to the issue of validity of the marriage. I do think that you can't get around the fact that this was a coercive interview, because whether or not the interview was coercive goes directly to whether or not you can believe the statement that she made. And if you look at that statement and you look at it in context of the rest of what was said there and the rest of the evidence that was submitted with regard to the marriage, I think there's more proof that the marriage was valid than that it wasn't. She – as I said, first she's told, if this marriage is valid, I'll approve it, but if not, I'm going to arrest you. Now, that's a great way to start an interview. It does put things on the right foot, doesn't it? Even once she said that she was paid $3,000 maybe and she was going to get approximately another three, she never was asked what it was for. She was never asked how she got the money. She never was asked what the promises were. You have the officer saying in his writings, so you were going to get the other $3,000 after he got his green card. Where does he get that? That isn't written in papers anywhere. That isn't in anything that she said. He just took that out of thin air, just as he took out of thin air the idea that when she decided to withdraw the petition, she couldn't just say, I wanted to withdraw it, but she had to put in all of this stuff about how they hadn't lived together, which, by the way, doesn't – is not what she said at any point in time, nor is it what the record indicates, but that she had to say that they'd never lived together and that she was paid in order to marry him, and that she couldn't just withdraw the petition, she had to do all of this, or else they were going to prosecute her. She had the right to just say, I'll withdraw the petition. He was lying to her. He was lying to her when he told her that she couldn't just withdraw the petition. He was intimidating her, as he had been intimidating her all along. There is nothing to dispute the fact that they lived together. There's nothing in the record that disputes the fact that they lived together with her mother in her family's house. They don't do that for a sham marriage. That in itself is – is basic to where we're at. In the I-130 interview, she – she did not dispute that they'd lived together. The G-28 – the G-325A doesn't dispute that, which is the biographic data information. Her mother's statement, which was then submitted later in the record and that is part of the C.A.R., also states clearly that they had lived together. The Board looked at all of this information when they initially granted the first motion to – to remand back for the adjustment interview, for the adjustment application. The immigration judge who heard all of this information at the asylum interview granted voluntary departure, which means that she found, after listening to both sides of the evidence regarding the – the issue of the sham marriage, that he was entitled to discretionary relief, he – which requires that you be a person of good moral character, that she had serious questions about whether or not the – there was a sham marriage. She thought that there was some question there, but she also questioned what the money was for and didn't think that it had been proven to her satisfaction to, again, to the point where she granted voluntary departure. She granted a benefit that required discretion and good moral character. And she sat there and watched him testify and heard all of that. Nobody paid any attention to that. The Board didn't even look at that. I think that weighs very heavily. Kennedy. He didn't appreciate it enough to go, because he didn't leave. He's still fighting, Your Honor. He hasn't – he hasn't violated the law. There is no char bar. He's never reached a point where he said, my voluntary departure has expired and I'm going to stay anyway. He's not there. He hasn't reached the point where the voluntary departure order is final. Okay. Thank you. May I begin? May I please the Court? My name is Joanne Johnson, and I represent the United States in the case before the Court today. This is a consolidated case. There's a petition for review in which Mr. Santos is seeking this Court's review of the agency's denial of asylum and withholding of removal. The government maintains that the record evidence does not compel a conclusion contrary to the agency's denial of asylum and withholding of removal. The second petition for review seeks this Court's review of the Board's decision denying the aliens' motion to reopen this case based upon adjustment of status. We respectfully request that that petition for review should be denied because the Board properly exercised its discretion in denying that motion to reopen because the alien failed to establish prima facie eligibility for adjustment of status. Lastly, the petitioner seeks this Court's review in her argument of a Board decision over which this Court lacks jurisdiction, and that involves the Board's denial of the petitioner's motion to reopen the visa revocation proceedings. First, with respect to the, I'll start with the motion to reopen since that's what the petitioner was addressing. She did not address the withholding of removal and asylum denial. First, with respect to the motion to reopen, the standard of review of the Court in reviewing a Board's decision is abuse of discretion. In this case, the Board properly exercised its discretion in denying the alien's motion to reopen. This is because the alien was required to establish prima facie eligibility for adjustment of status. In establishing that, the alien would have to show that an immigrant visa was immediately available to him. He did not. Instead, the alien contended that if his visa revocation proceedings, if he prevailed in his visa revocation proceedings before the Board, then perhaps he could get adjustment of status, and then perhaps he could get his, the petition would be accepted, and then he could get a visa, and therefore he'd be eligible for adjustment of status. The Board properly concluded that he did not have an immigrant visa, that his contention was based on speculation, and therefore the Board denied petitioner's motion to reopen. Second, this Court lacks jurisdiction over the Board decision that petitioner was addressing, which actually is not part of the administrative record in this case, in fact, petitioner attached it to her brief, and it's outside the record evidence. Specifically, the Board decision regarding the visa revocation involves a collateral matter, it is involving visa proceedings, not removal proceedings, which is under 1252 what this Court has jurisdiction over. Therefore ---- What is your view of what the bottom line should be in our review of this case, as is postulated? The bottom line should be, one, the Court lacks jurisdiction over this Board decision regarding the visa revocation proceedings. Two, the record does not compel a conclusion contrary to the agency's decision denying asylum and withholding of removal, therefore the petition for review over that should be denied. And lastly, the motion to reopen petition for review should be denied because the Board has not approved the visa revocation proceedings. Does this Court have any questions for the government, any additional questions? No. I wanted you to hear her bottom line so you can tell us why she's wrong, if you can. Okay. Well, I think that the Court has jurisdiction over the visa petition revocation motion to reopen because of the fact that the visa petition, as we discussed earlier, is essential to the adjustment, to his removal proceeding, to whether or not he gets to stay in the United States. And I think that case law is clear that all of this needs to be considered together. Well, giving you a certain benefit of the doubt there, we may have jurisdiction we, I think the government says we have jurisdiction to review the denial of reopening. But so you've got to have an answer to why we need to reopen. And I think that's why we should grant why there should have been a grant of the reopening. Well, I think we were talking about two different motions to reopen, and I grant you that that gets confusing in this case anyway. I was talking about the motion to reopen on the visa revocation. I think that in the motion to reopen, the adjustment there, which I don't think the government was arguing jurisdiction, I think she was arguing merits on that. I think that the Board misapplied the law. They ignored Velarde-Pacheco, which is their own case, which says that or which does not require that a visa petition be approved. It requires that it be immediately available. It was immediately available. She's an immediate relative. She's a U.S. citizen. That makes it an immediate available. Under all of the requirements for Velarde-Pacheco, he qualifies. It was timely. It was not out of time. It was not out of date. It was not barred by Schar. It was not opposed by the government. There was proof of the bona fides of the marriage. There wasn't a reason for them not to reopen. And yet they didn't even address Velarde-Pacheco, and they didn't adhere by their own statement, by their own law. And for that reason, the motion to reopen should be – should have been granted, and for that reason, this Court should go with – should grant the petition. And I've already discussed the issue with regard to the marriage, unless this Court has any other questions. Thank you. Thank you. The case just argued is submitted for decision. Before hearing the last case, the Court will take a brief recess.
judges: Schroeder, Farris, Rawlinson